STEVEN MURRAY, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 26075

ROBERT BYFORD, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 26653

CHRISTOPHER GARTH WILLIAMS, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 26672

January 3, 1997                          930 P.2d 121

*David M. Schieck,* Las Vegas, for Appellant Murray.

---

[2]THE HONORABLE ROBERT E. ROSE, Justice, voluntarily recused himself from participation in this appeal.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Brian Kochevar,* Deputy District Attorney, Clark County, for Respondent.

*David M. Schieck,* Las Vegas, for Appellant Byford.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *William D. Kephart,* Deputy District Attorney, Clark County, for Respondent.

*McDonald & Associates,* Las Vegas, for Appellant Williams.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *William D. Kephart,* Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

These appeals have been consolidated for the purpose of this opinion. We conclude that in each case the State violated the appellants' Fifth Amendment rights. We therefore reverse and remand each case for a new trial.

## *FACTS*

### *MURRAY v. STATE*

On March 13, 1987, Paul Eugene Dudley was murdered in the parking lot of a North Las Vegas casino. His partly burned body was found several days later in the desert. Appellant Steven Murray and chief prosecution witness Melanie Chapman were present at the murder. At Murray's trial, each accused the other of the act. Murray was originally charged with the murder in 1988. Insufficient evidence was presented at his preliminary hearing to bind him over for trial, and the charges were dismissed without prejudice. Chapman was tried for aiding and abetting in the murder in 1993, but she was acquitted. In 1993, Murray was indicted for the murder by a grand jury. He was tried before a jury and convicted in 1994.

### *Facts*

On March 20, 1987, Dudley's body was discovered at the bottom of a wash in a remote location several miles north of Las Vegas. The body had post-mortem burns on about thirty percent of its area. A stab wound to Dudley's heart had killed him.

The main prosecution witness was Melanie Chapman, formerly Melanie Thomas, who testified as follows. She met appellant Murray and his brother Billy Murray (Billy) at a bar in New Mexico in early March 1987. They decided to drive to Las Vegas together in the brothers' pickup truck and camper. Chapman went with Murray and Billy to the Silver Nugget Casino on March 13, 1987, a day or two after they arrived in Las Vegas. They went in the morning and started drinking and gambling. That evening Chapman began to talk with the victim, Dudley, who was at the casino bar, and he offered her a ride to her mother's house in Las Vegas. Chapman and Dudley went to the camper to get her things from it. Murray approached and demanded to know what they thought they were doing. Chapman went inside the camper, and when she came out, Dudley was lying on the ground in back of the truck. Murray held a long knife, which he threw into the camper. Murray put Dudley into the camper and ordered

Chapman inside too. Murray closed the door and the tailgate and began to drive the truck. Chapman tried to open the door, but the tailgate was closed which prevented the door from opening. (Murray presented evidence that the tailgate could not close because the camper extended beyond the tailgate.) After driving onto a dirt road, Murray stopped and pulled Dudley from the camper and dragged him away. As Murray drove away with Chapman still in back in the camper, she saw a fire through the window.

Two days later, Chapman flew home to New Mexico. She was arrested the day after that on cocaine charges. Beginning in July 1987, Las Vegas Metropolitan Police Department detectives spoke to Chapman several times about Dudley's murder. Chapman told detectives several different stories before she ever stated that she was present when Murray killed Dudley. Two years later, Chapman was arrested for Dudley's murder and extradited to Nevada. She was tried for the crime but acquitted. On cross-examination at Murray's trial, Chapman admitted that she used methamphetamine regularly and other drugs occasionally. She had felony convictions for writing bad checks and for drug trafficking.

Creede White testified for the State. He knew Billy, and Billy, Murray, and Chapman visited his apartment in North Las Vegas in March 1987. Later that month, White went with Billy and Murray, who were driving to Kansas. During the trip, Murray told White that he and Chapman went to roll a guy, the guy got tough, and he (Murray) stabbed him. Murray further told White that they dumped the body in the desert and tried to burn it with gasoline.

Bernestine Love testified for the defense. She testified that she was in the Clark County Detention Center with Chapman in April 1990 when Chapman was being detained for her trial and that Chapman spoke with her three times about the murder. Chapman told Love that she had met a trick at a nightclub, whom she rolled because she lacked money. The trick ended up being killed by Murray. (The State had presented this evidence at Chapman's trial.)

Murray testified that on the day in question, he and Chapman were at the Silver Nugget. At some point in the evening, Murray saw Chapman walk outside with an older gentleman. When she did not return after ten or fifteen minutes, he became concerned and went outside. He found her at the camper, and she drove them away from the casino. He asked where they were headed, and she told him she had killed somebody. She turned off on a dirt road, pulled a body from the camper, poured Coleman fuel on it, and lit it on fire. Murray did not report the murder because he

was afraid he would be blamed for it. Murray and Chapman drank the next day and argued; she ran off, and Murray did not see her again until the trial. Billy's friend, White, went to Kansas with Murray and Billy, but Murray denied ever telling White that he killed anyone. Murray thought that White might have overhead Murray telling his brother that Chapman killed someone.

The record further shows that although Murray surrendered to the police in October 1988, he did not make a statement to authorities until he testified before a grand jury in September 1993. During direct examination of Detective Alfred Leavitt, who took Murray into custody in October 1988, the prosecutor asked:

> Q Did Mr. Murray ever make any statement to yourself about anything of this crime?
> A He did not.
> Q At the time of [Chapman's] trial, did you have any reason to believe that Mr. Murray, Mr. Steven Murray, the defendant, would testify at [Chapman's] trial?
> A No.

Defense counsel did not object. On redirect, the State established that Murray had never made any statement to the police since he was arrested in 1988 and that it would have been improper for the detective to seek any statement from Murray after he had asked for an attorney.

During cross-examination of Murray, the prosecutor questioned Murray regarding his post-arrest silence or referred to it indirectly several times. The prosecutor's questions included "After you conferred with this attorney . . . did you go tell Detective Leavitt your story?" and "Did you testify at your preliminary hearing in 1988?" During closing argument, the prosecutor referred to Murray's silence as evidence of his lack of veracity and his guilt, making the following statements. "He's had over six years to manufacture this." "There's another inescapable fact that you can conclude: What kind of person maintains silence for six and-a-half years about the horrible murder and burning of a human being? The man that did it." No objection was made to any of these questions or remarks.

The jury found Murray guilty of first degree murder with use of a deadly weapon and not guilty of robbery. The district court entered judgment accordingly and sentenced him to two consecutive sentences of life without the possibility of parole.

## BYFORD v. STATE and WILLIAMS v. STATE

In March of 1991, Monica Wilkins was shot to death. Her body was burned and left in the desert. Todd Smith and appel-

lants Robert Byford and Christopher Williams were charged with the murder. Smith agreed to testify against Byford and Williams. Byford and Williams were found guilty by a jury. Following the penalty hearing held on July 13, 1994, the jury returned verdicts of death by lethal injection for both men.

*Facts*

At trial, Smith testified that he saw Byford and Williams kill Wilkins and burn her body. He further testified that he returned to the scene of the murder with Byford and Williams to bury the body. Byford and Williams testified that Smith had killed Wilkins and that Byford then set the body on fire in an attempt to conceal what Smith had done. A week or two later, Byford and Williams became worried that the body would be discovered and decided to go out and bury the remains. In addition to the testimony of Smith, Williams, and Byford, the State presented several witnesses who claimed to have heard Byford and Williams bragging about the murder.

During cross-examination of Williams the following exchange took place:

> Q: Chris, are you aware that the District Attorney's office waited for three years to hear what you had to say about this case?
> A: Yes, sir.
> Q: Now you come in here and you tell these twelve individuals, fourteen individuals, your part of this case?
> A: Yes, sir.
> Q: Do you really expect these individuals to believe you after that long?

During closing arguments, the prosecutor made the following statement:

> Chris would have you believe he sat in the truck. He told us it was disgusting to see her burn, while he's on LSD, 80 feet away, while he is sitting in the truck worrying about the keys, trying to drive away. And they tell you that. They tell you that and they tell us that just for the first time on Friday. The prosecutor went on,
> Three years have passed since Monica Wilkins lost her life. A year and-a-half it took to investigate this crime. The defendants took the stand and they admitted that they have spoken with one another practically once a week since it's happened. They have been in court every single time this case has been here. They listened to testimony at a preliminary hearing; they listened to testimony for two weeks from this stand. Then and only then—

MR. SCHIECK: Your Honor, I'm going to object. This is improper argument concerning the defendants sitting here in court listening to testimony.

MR. McDONALD: Join in the objection, Your Honor.

THE COURT: Sustained.

[PROSECUTOR]: Then they come in here and they give you their story.

MR. SCHIECK: Objection again, Your Honor. It's the same argument.

MR. McDONALD: Join, Your Honor.

THE COURT: Overruled.

## DISCUSSION

"The prosecution is forbidden at trial to comment upon a defendant's election to remain silent following his arrest and after being advised of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966)." Neal v. State, 106 Nev. 23, 25, 787 P.2d 764, 765 (1990); *see also* Doyle v. Ohio, 426 U.S. 610 (1976). Although the record does not show that Murray was advised of his *Miranda* rights, this court has held that impeaching a defendant with his or her post-arrest silence constitutes prosecutorial misconduct whether or not the defendant received a *Miranda* warning. Coleman v. State, 111 Nev. 657, 664, 895 P.2d 653, 657 (1995). Further, the record shows that Murray invoked his right to consult an attorney before speaking. Therefore, he clearly elected to remain silent, and the State improperly commented on his silence numerous times.[1] Although Murray failed to object to this misconduct at trial, this court may review plain error or issues of constitutional dimension sua sponte despite a party's failure to raise an issue below. Emmons v. State, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991). Byford and Williams were informed of their *Miranda* rights and, like Murray, chose to remain silent. The State improperly commented on their silence both during cross-examination of Williams and during closing argument.

---

[1]The prosecutor also referred to Murray's silence after the murder in March 1987 until his arrest in October 1988. Comment on this pre-arrest silence was not improper. Jenkins v. Anderson, 447 U.S. 231, 240 (1980). Since the prosecution improperly commented on Murray's silence after his arrest and before the charges were dismissed without prejudice, it is not necessary to decide whether comment on his post-dismissal silence was improper. It is an interesting question because after the dismissal, Murray was not in custody for several years, but he had been charged with the crime once and knew that he was still a suspect and still liable for prosecution for the murder. However, the State never distinguished between these periods of silence and did not limit its comments at trial to Murray's pre-arrest silence or his post-dismissal silence.

This court must determine if the improper comments were harmless beyond a reasonable doubt. McCraney v. State, 110 Nev. 250, 256, 871 P.2d 922, 926 (1994). We have held that reference during cross-examination of a defendant and closing argument to the defendant's post-*Miranda* silence is not harmless error ''when the defendant's credibility is crucial to his defense and the prosecutor's comments are deliberate and repetitious.'' *Id.*

In Murray's case, the comments were made during cross-examination of the defendant, closing argument, and examination of a state witness. Murray's credibility was crucial to his defense: the case was primarily his word against Chapman's. The prosecutor's comments were deliberate and repeated. In the trial of Byford and Williams, the improper comments occurred on cross-examination and during closing argument and were deliberate. The credibility of both men was crucial to their defense, which was that the murder had actually been committed by the only other eyewitness to the crime.

In none of these cases can we conclude beyond a reasonable doubt that the prosecutorial misconduct was harmless error and the juries would have reached the same verdict absent the improper comments. Accordingly, we reverse the judgments of conviction of Murray, Byford, and Williams and remand all three cases for new trials.